**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **BEN-TREI OVERSEAS, L.L.C. d/b/a** | ) | |
| **BEN-TREI METALS and ALLOYS, and** | ) | |
| **BEN-TREI LTD.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Case No. 09-CV-153-TCK-TLW** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **GERDAU AMERISTEEL US, INC. et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**OPINION AND ORDER**

Before the Court are Plaintiff Ben-Trei Overseas, LLC's Motion for Partial Summary

Judgment Against Gerdau Ameristeel US, Inc. (Doc. 56); Plaintiff Ben-Trei Overseas, LLC's

Motion for Partial Summary Judgment Against Gerdau Macsteel, Inc. (Doc. 58); Defendant Gerdau

Ameristeel US Inc.'s Motion for Summary Judgment (Doc. 59); and Defendant Gerdau Macsteel,

Inc.'s Motion for Summary Judgment (Doc. 60).

**I.    Factual Background**

Plaintiff Ben-Trei Overseas, LLC ("Ben-Trei")[1] is a Tulsa-based company in the business

of supplying metals and metal alloys used in steel production.  Defendant Gerdau Ameristeel US,

---

[1]     On February 11, 2009, Ben-Trei moved to add Ben-Trei, Ltd. as a Plaintiff in this case
because Defendants had raised "issues in discovery regarding the payment of certain
expenses, such as storage costs, by Ben-Trei Ltd. on behalf of Ben-Trei Overseas."
(Unopposed Mot. to Add Party-Plaintiff 1.)  Defendants did not object to such relief, and the
Court granted the motion.  Thereafter, Ben-Trei Ltd. filed a Notice of Incorporation and
Adoption of Allegations, wherein it "adopted and incorporated" the allegations in Ben-Trei's
Amended Complaint. (*See* Notice of Incorporation 1.)  Because Ben-Trei Ltd. was not
involved in the summary judgment motions currently before the Court, the Court's reference
to "Ben-Trei" in this Order only refers to Plaintiff Ben-Trei Overseas, LLC.

Inc. ("Ameristeel") operates steel mills in Beaumont, Texas ("Beaumont Mill"); Cartersville, Georgia ("Cartersville Mill"); and Midlothian, Texas ("Midlothian Mill").[2] Defendant Gerdau Macsteel, Inc. ("Macsteel") operates steel mills in Monroe, Michigan ("Monroe Mill") and Fort Smith, Arkansas ("Fort Smith Mill").[3] [4]

Ben-Trei filed an Amended Complaint on April 16, 2009, alleging claims for breach of contract, breach of implied contract, breach of the duty of good faith and fair dealing, and promissory estoppel against Ameristeel and Macsteel.[5] Ben-Trei generally alleges that: (1) it entered into contracts with Ameristeel and Macsteel for the sale of certain materials; and (2) Ameristeel and Macsteel have only taken delivery of a fraction of the contracted materials, thereby breaching the relevant contracts.

The parties have filed various motions for summary judgment, which are currently pending before the Court. Specifically, Ben-Trei seeks partial summary judgment as to its breach of contract claim against Ameristeel and Macsteel, arguing the Court should determine as a matter of law that: (1) the contracts at issue constitute fixed-quantity contracts, as opposed to requirements contracts; and (2) Ameristeel and Macsteel both breached their contracts with Ben-Trei. Ameristeel and Macsteel also seek summary judgment as to Ben-Trei's breach of contract claim, contending that the Court should determine as a matter of law that: (1) the contracts at issue constitute requirements

---

[2]     Ameristeel operates additional steel mills in the United States that are not involved in the instant matter.

[3]     Macsteel operates a second steel mill in Michigan that is not involved in this case.

[4]     Ameristeel and Macsteel will be collectively referred to as "Defendants" when applicable.

[5]     Ben-Trei also brought these claims against Defendant Gerdau Ameristeel Corporation but later dismissed such claims.

contracts; and (2) Ameristeel and Macsteel did not breach said contracts.  Ameristeel and Macsteel additionally seek summary judgment as to Ben-Trei's remaining claims of breach of implied contract, breach of the duty of good faith and fair dealing, and promissory estoppel.

      **A.**      **Ben-Trei's Relationship with Ameristeel**

On February 26, 2008, Ameristeel e-mailed a request for quote ("RFQ") to potential suppliers regarding the supply of various metals and alloys for its mills during the second and third quarters of 2008 ("February Ameristeel RFQ").  The February Ameristeel RFQ stated that Ameristeel was "soliciting bids for its requirements of several Ferro Alloys for [its] 15 mills in North America" and further advised that an attached spreadsheet contained Ameristeel's "Instructions, Terms of Purchase, Specifications, packaging and estimated quarterly quantity requirements for each mill."  (February Ameristeel RFQ, Ex. 1 to Ameristeel's Mot. for Summ. J.)  Further, the February Ameristeel RFQ warned that the "quantity noted is an estimate only and may fluctuate according to market conditions."  (*Id.*)  Finally, the document also cautioned that "[t]here are no minimum quantities guaranteed" and that "[a]ctual deliveries will be scheduled by each mill and based on their actual requirements of the product only."  (*Id.*)  Ben Thigpen ("Thigpen"), an employee at Ben-Trei, was included on the distribution list and received the e-mail.  There is no evidence in the record that Ben-Trei and Ameristeel entered into a contract as a result of the February Ameristeel RFQ.

Thereafter, in May and June 2008, Ameristeel sought quotes for the supply of ferromanganese during the second half of 2008 and accepted Ben-Trei's bid for the provision of ferromanganese to the Beaumont, Midlothian, and Cartersville Mills.  The following correspondence between the parties memorializes such agreement.  On May 30, 2008, James Cooper ("Cooper"),

an Ameristeel consultant, sent an e-mail to Thigpen, stating: "Attached please find our RFQs for Q3 & Q4 2008." ("May Ameristeel RFQ"). Cooper attached various spreadsheets to his e-mail, which were to be used in submitting the quotes. Included in such spreadsheets were columns entitled "Q3 Forecast" and "Q4 Forecast," which outlined various amounts of materials. (May Ameristeel RFQ, Ex. 1 to Ameristeel's Resp. to Pl.'s Mot. for Partial Summ. J. Against Ameristeel at 2-5.) Thigpen responded to Cooper's e-mail on June 4, 2008, providing the bids on behalf of Ben-Trei. In his e-mail, Thigpen stated that Ben-Trei was "offering against [Ameristeel's] Q3 requirement for HC FeMn only at this time" and further indicated that Ben-Trei was "offering against [Ameristeel's] MC FeMn requirement at Beaumont for both Q3 and Q4." (6/4/08 Thigpen E-mail, Ex. 4 to Ameristeel's Mot. for Summ. J.) One day later, on June 5, 2008, Thigpen sent another e-mail to Cooper stating that "[o]vernight [he] confirmed that [Ben-Trei could] offer all [Ameristeel's] full requirement of HC FeMn for Q3 and not just the 3000 GT as stated yesterday." (6/5/08 Thigpen E-mail, Ex. 5 to Ameristeel's Mot. for Summ. J.)

Thereafter, on June 10, 2008, Cooper e-mailed Thigpen to inform Thigpen that he recommended that Ben-Trei be awarded the "remaining Q3 and Q4 requirements for Beaumont." (6/10/08 Cooper E-mail, Ex. 7 to Ameristeel's Mot. for Summ. J.) Cooper again e-mailed Thigpen on June 18, 2008, stating that Ameristeel would "take you up on your offer to cover [its] Q3 requirements" (6/18/08 Cooper E-mail, Ex. 8 to Ameristeel's Mot. for Summ. J.) Also on June 18, 2008, Bill Dickerson ("Dickerson"), Manager of Materials Procurement for Ameristeel and Macsteel, informed Thigpen that Ben-Trei's bids had been accepted and requested that Thigpen "confirm quantities and price by location" to ensure they were "on the same page." (6/18/08 Dickerson E-mail, Ex. 2 to Pl.'s Mot. for Partial Summ. J. Against Ameristeel.) Thigpen responded

4

to Dickerson's e-mail with such confirmation regarding the Beaumont, Midlothian, and Cartersville Mills.  (*See* 6/19/08 Thigpen E-mail, Ex 2 to Pl.'s Mot. for Partial Summ. J. Against Ameristeel.)[6] Specifically, Thigpen's e-mail reads as follows:

- Beaumont MC FeMn (LC FeMn): 350 [net tons] of 4000 [pound] supersack material at $2.40 per pound Mn ratably over Q3 and Q4; 80 [net tons] of 50 [pound] bagged material at $2.48 per pound Mn ratably over Q3 and Q4.

- Cartersville: HC FeMn: 150 [net tons] in bulk at $1.445 per pound of alloy ratably over Q3.

- Midlothian: HC FeMn: 22 [net tons] in bulk at $1.445 per pound of alloy ratably over Q3. . . .

(*Id.*)  Dickerson responded to the e-mail by asking Thigpen to confirm that these were "delivered prices," which Thigpen did.  (6/19/08 Dickerson E-mail, Ex. 2 to Pl.'s Mot. for Partial Summ. J. Against Ameristeel; 6/19/08 Thigpen E-mail, Ex. 2 to Pl.'s Mot. for Partial Summ. J. Against Ameristeel.)  Ben-Trei claims that subsequent to this e-mail exchange, Cooper contacted Ben-Trei and awarded Ben-Trei the business for the Midlothian and Cartersville Mills during the fourth quarter of 2008.  Ameristeel disputes this allegation, claiming that Cooper was not authorized to award contracts to suppliers on behalf of Ameristeel.

The Cartersville and Midlothian Mills failed to issue purchase orders to Ben-Trei for any ferromanganese during 2008.  The Beaumont Mill, however, issued a purchase order to Ben-Trei on August 21, 2008 for 16,000 pounds of medium-carbon ferromanganese ("Beaumont Purchase Order").  This was the only purchase order issued by the Beaumont Mill during the relevant time period.  Ameristeel provided an affidavit from Dickerson, wherein Dickerson states that during the

---

[6]     This e-mail also includes a quote for Ameristeel's Mill in St. Paul, but said mill is not involved in the underlying dispute.

second half of 2008, and particularly during the last three months of that year, production at the Beaumont, Midlothian, and Cartersville Mills reduced significantly.  Dickerson further states that the decline in production resulted from a slowdown in orders for the steel products produced by the mills, and because of such decline, the mills were "unable to take all of the estimated quantities of [ferromanganese] from Ben-Trei during the second half [of] 2008." (Dickerson Affidavit, Ex. 9 to Ameristeel's Mot. for Summ. J.)  Dickerson also states that the Beaumont, Midlothian, and Cartersville Mills did not obtain any ferromanganese from a vendor other than Ben-Trei during the second half of 2008.

### B.     Ben-Trei's Relationship with Macsteel

On October 31, 2007, Mike Weeks ("Weeks"), purchasing manager for Macsteel's Fort Smith Mill, e-mailed two RFQs for Macsteel's 2008 supply of "Standard Ferromanganese, Bulk and Packaged" and "Silicomanganese, Bulk" to an undisclosed list of recipients ("2008 Macsteel RFQs").  The 2008 Macsteel RFQs state as follows: "2008 Annual Requirements and Sizing Per Plant (note: quantities are estimated only and may vary up or down)." (2008 Macsteel RFQs, Ex. 1 to Macsteel's Mot. for Summ. J.)  Thigpen received the 2008 Macsteel RFQs and, on November 6, 2007, e-mailed Weeks, among other Macsteel employees, with a bid on behalf of Ben-Trei. Thigpen's e-mail reads, "Please find attached our standard ferromanganese offer for [Macsteel's] 2008 requirements." (11/6/07 Thigpen E-mail, Ex. 3 to Macsteel's Mot. for Summ. J.)  Attached to the e-mail was a one-page document outlining Ben-Trei's bid for the provision of a specific quantity (2200 gross tons) of ferromanganese to Macsteel.  On November 8, 2007, Weeks responded to Thigpen's e-mail, stating "you are awarded the Std FeMn business for Macsteel's Fort Smith and Monroe plants." (11/08/07 Weeks E-mail, Ex. 4 to Macsteel's Mot. for Summ. J.)

Thereafter, both the Fort Smith and Monroe Mills sent purchase orders to Ben-Trei for the supply of ferromanganese during 2008. Specifically, on November 28, 2007, the Fort Smith Mill issued two purchase orders — one for 3,512,000 pounds of "Std Fe Manganese" in bulk and one for 638,000 pounds of bagged "Std Fe Manganese" ("Fort Smith Purchase Orders"). The Fort Smith Purchase Orders covered the supply of these materials for the entire 2008 year, as both stated that they were effective from "1/2/08 - 12/31/08." (*See* Fort Smith Purchase Orders, Ex. 5 to Macsteel's Mot. for Summ. J.) Further, the Fort Smith Purchase Orders stated that: (1) the "total quantity is estimated"; and (2) "Second half 2008 Price to be Mutually Agreed Prior to Start of 2nd Half 2008." (*Id.*)

The Monroe Mill issued two purchase orders to Ben-Trei on December 28, 2007 for its supply of high carbon ferromanganese during 2008 ("Monroe Purchase Orders"). One purchase order sought 1,850,000 pounds of the material. The amount of material sought in the second purchase order is unclear from the record. The exhibit provided by Macsteel indicates that the second purchase order sought 644,000 pounds of bagged high carbon ferromanganese, while the exhibit provided by Ben-Trei indicates that the second purchase order sought 600,000 pounds of the material. (*Compare* Ex. 2 to Pl.'s Mot. for Partial Summ. J. Against Macsteel *with* Ex. 6 to Macsteel's Mot. for Summ. J.) The Monroe Purchase Orders state as follows: "Pricing effective first half of 2008. Second half to be supplied at Ryan's Average mid-point for the month prior to shipment." (Monroe Purchase Orders, Ex. 2 to Pl.'s Mot. for Partial Summ. J.)

On March 5, 2008, Ben-Trei sent what appears to be a quote for prices for the third and fourth quarter of 2008 for 1400 gross tons of high carbon ferromanganese. (*See* 3/5/08 Quote, Ex. 3 to Pl.'s Mot. for Partial Summ. J. Against Macsteel.) Ben-Trei claims, and Macsteel does not

7

dispute, that Macsteel began utilizing these prices beginning in the third quarter of 2008.  Indeed, the record reflects that both Weeks and Kathy LaFayette ("LaFayette"), purchasing manager for the Monroe Mill, sent e-mails to Thigpen confirming the pricing for the second-half of 2008.  (*See* 4/4/08 Weeks E-mail, Ex. 5 to Pl.'s Mot. for Partial Summ. J. Against Macsteel (telling Thigpen that he would "update the price on remainder of material"); 7/7/08 LaFayette E-mail, Ex. 4 to Pl.'s Mot. for Partial Summ. J. Against Macsteel (confirming third quarter pricing in e-mails with Thigpen).)

Macsteel provided affidavits from Weeks and LaFayette, wherein Weeks and LaFayette state that during the second half of 2008, and particularly during the last three months of the year, production at the Fort Smith and Monroe Mills was reduced significantly.  Weeks and LaFayette state that the decline in production resulted from a slowdown of orders received by the mills, and because of such decline, the Fort Smith and Monroe Mills did not release all of the estimated quantities of ferromanganese from Ben-Trei during 2008.  Specifically, the Fort Smith Mill released approximately fifty-eight percent of the material outlined in the Fort Smith Purchase Orders while the Monroe Mill released approximately eighty-five percent of the material outlined in its purchase orders.  On October 16, 2008, Weeks sent an e-mail to Thigpen, stating: "[F]ort Smith intends to use the Std FeMn material we have on order with Ben-Trei.  It may take a little longer to use however due to the slowdown in business.  If that is an issue please let me know."  (10/16/08 Weeks E-mail, Ex. 7 to Pl.'s Mot. for Partial Summ. J. Against Macsteel.)  Both Weeks and LaFayette state that the Fort Smith and Monroe Mills did not have any agreements with vendors other than Ben-Trei to supply ferromanganese during 2008 and did not purchase ferromanganese from another supplier during 2008.

The record reflects additional correspondence between the parties in early 2009.  On January 2, 2009, Gimo Berry ("Berry"), a Macsteel employee at the Fort Smith Mill, sent an e-mail to Thigpen entitled "January Load Std.Fe Mn," which requested a delivery date of January 7, 2009 for the "Std Fe Mn."  (1/2/09 Berry E-mail, Ex. 8 to Pl.'s Mot. for Partial Summ. J. Against Macsteel.)  Minutes later, however, Berry sent a second e-mail, requesting that Thigpen disregard his previous e-mail, as it was "sent in error."  (*Id.*)  Also on January 2, 2009, LaFayette sent an e-mail to Ben-Trei, requesting that a delivery be scheduled for January 8th, 2009 for the Monroe Mill. (1/2/09 LaFayette E-mail, Ex. 9 to Pl.'s Mot. for Partial Summ. J. Against Macsteel.)

On January 5, 2009, Thigpen forwarded Berry's e-mails to Dickerson, stating: "I would infer from this that another supplier else received PO #90821 and we are not going to be shipping HC FeMn to Fort Smith in January? Please confirm the status of our ongoing discussions about the shortages we have against carryover contracts."  (1/5/09 Thigpen E-mail, Ex. 2 to Pl.'s Resp. to Macsteel's Mot. for Summ. J.)  Dickerson responded to Thigpen's e-mail and informed Thigpen that Macsteel could not "take material when [Ben-Trei and Macsteel] are in disagreement about the price."  (1/5/09 Dickerson E-mail, Ex. 2 to Pl.'s Resp. to Macsteel's Mot. for Summ. J.)  Dickerson further stated that "[i]f we can agree on price, we can take material."  (*Id.*)

On January 16, 2009, the Monroe Mill issued two purchase orders to one of Ben-Trei's competitors, Medima Metals, LLC ("Medima Metals"), for the supply of high carbon ferromanganese in 2009 ("Medima Metals Purchase Orders").  The amount of material requested mirrors that included in the Monroe Purchase Orders issued to Ben-Trei in 2008.  Specifically, one of the purchase orders sought 644,000 pounds of the material in bagged form, while the other sought

9

1,850,000 pounds of the material.  (*See* Medima Metals Purchase Orders, Ex. 3 to Pl.'s Resp. to Macsteel's Mot. for Summ. J.)

### C.     2009 Statements by Thigpen and Ben-Trei's Counsel

In early 2009, the parties engaged in negotiations regarding Ameristeel and Macsteel's failure to accept delivery of the full quantity of materials that Ben-Trei contends was included in the relevant contracts.   In conjunction with these negotiations, Thigpen sent an e-mail to certain employees at Ameristeel and Macsteel on January 30, 2009, including Dickerson, Cooper, LaFayette, and Weeks.   Therein, Thigpen stated that Ben-Trei was "appreciative that [Ameristeel and Macsteel] [were] engaged in discussions with [Ben-Trei] regarding a resolution of the 2008 Ferroalloys Contracts."  (1/30/09 Thigpen E-mail, Ex. 12 to Ameristeel's Resp. to Pl.'s Mot. for Partial Summ. J. Against Ameristeel.)  Thigpen further stated that "[a]s take or pay contract or as a requirements contract any termination must be in good faith."  (*Id.*)

Thereafter, on February 6, 2009, Ben-Trei's counsel, William Eric Culver ("Culver") sent a written letter to Robert Wallace, corporate attorney for Ameristeel.  In said letter, Culver outlined the contract between Ben-Trei and Ameristeel for the supply of materials to the Beaumont, Midlothian, and Cartersville Mills.  Culver additionally noted that Ameristeel had "refused to take any more material at the prices which were agreed to" and that "such refusal to take any material . . . constitute[d] a breach" of the agreement between the parties.  (2/6/09 Culver Letter, Ex. 13 to Ameristeel's Resp. to Pl.'s Mot. for Summ. J. Against Ameristeel at 1.)  Finally, Culver stated that "[a]s a requirements contract any termination must be in good faith."  (*Id.* at 2.)[7]

---

[7]     In its motions for partial summary judgment against Ameristeel and Macsteel, Ben-Trei attaches the affidavit of Charles Bendana ("Bendana").  Ameristeel and Macsteel both urge the Court to disregard certain paragraphs of said affidavit because they contend that Bendana

II.     **Summary Judgment Standard**

Summary judgment is proper only if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that no genuine issue of material fact exists. *See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006) (citation omitted). The Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party. *Id.* (citation omitted). However, the party seeking to overcome a motion for summary judgment may not "rest on mere allegations" in its complaint but must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The party seeking to overcome a motion for summary judgment must also make a showing sufficient to establish the existence of those elements essential to that party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-33 (1986). When cross motions for summary judgment are filed, the court is "entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts." *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000). Further, cross motions for summary judgment are to be treated separately, as the denial of one does not require the grant of the other. *Id.*

III.    **Breach of Contract Claim**

Ben-Trei argues that both Ameristeel and Macsteel entered into "fixed-quantity" contracts with Ben-Trei and breached said contracts by failing to take the full quantity of materials specified

---

does not have the personal knowledge to make the assertions therein. The Court need not address this argument, as it did not rely on such paragraphs in its recitation of the facts or determination of the issues in this case.

therein.  Ameristeel and Macsteel argue that the contracts at issue constitute "requirements" contracts, permitting them to reduce their requirements for the relevant materials as long as such reduction occurred in good faith.  Therefore, according to Ameristeel and Macsteel, their failure to take the full estimate of materials does not constitute a breach of their agreements with Ben-Trei.

### A.    Contracts at Issue

Ben-Trei alleges the existence of the following contracts with Defendants: (1) contracts with Ameristeel for the sale of ferromanganese to the Beaumont, Cartersville, and Midlothian Mills for the third and fourth quarters of 2008; and (2) contracts with Macsteel for the sale of ferromanganese to the Fort Smith and Monroe Mills during the entirety of 2008.[8]

### 1.    Contracts between Ben-Trei and Ameristeel

Ameristeel failed to present any evidence or argument disputing the contention that it entered into contracts with Ben-Trei for: (1) the sale of ferromanganese to the Beaumont Mill for the third and fourth quarters of 2008; and (2) the sale of ferromanganese to the Cartersville and Midlothian Mills for the third quarter of 2008.  Based on the relevant correspondence between Ameristeel and Ben-Trei and Ameristeel's lack of argument, the Court finds, as a matter of law, that the parties entered into such contracts.

---

[8]    It is unclear from Ben-Trei's briefing whether Ben-Trei contends that: (1) it entered into one contract with Ameristeel and one contract with Macsteel, encompassing the supply of ferromanganese for multiple mills, or (2) it entered into multiple contracts with both Ameristeel and Macsteel for each of their separate mills.  For the purposes of this Order and for ease of reference, the Court will assume that Ben-Trei asserts the existence of multiple contracts with Ameristeel and Macsteel for each of the mills specified herein.

Ameristeel does dispute, however, that Ben-Trei and Ameristeel entered into a contract for the sale of ferromanganese to the Cartersville and Midlothian Mills for the fourth quarter of 2008. Ben-Trei presents testimony indicating that such a contract was formed when Cooper contacted Ben-Trei and awarded Ben-Trei this business.   Ameristeel, on the other hand, presents testimony indicating that Cooper did not have the authority to award this business on behalf of Ameristeel. Therefore, based on the evidence in the record, there is clearly a genuine issue of material fact as to whether contracts existed between Ben-Trei and Ameristeel for the sale of materials to the Cartersville and Midlothian Mills for the fourth quarter of 2008.  Ben-Trei concedes as much in its briefing.  (*See* Pl.'s Reply in Support of Mot. for Partial Summ. J. Against Ameristeel 2 (stating "Ben-Trei acknowledges that whether there existed contracts between Ben-Trei and Ameristeel's Cartersville and Midlothian Mills for the fourth quarter of 2008 may constitute an issue for trial").) Therefore, this issue is left for the jury.[9]

### 2.     Contracts Between Ben-Trei and Macsteel

Macsteel does not dispute Ben-Trei's allegation that Macsteel and Ben-Trei entered into contracts for the sale of ferromanganese to the Fort Smith and Monroe Mills during the entirety of 2008.  Therefore, based on the record and the lack of argument to the contrary, the Court finds, as a matter of law, that Macsteel and Ben-Trei entered into such contracts.

### B.     Whether Contracts Constitute "Fixed-Quantity" or "Requirements" Contracts

In determining whether the contracts at issue constitute fixed-quantity or requirements contracts, the Court first notes that although the parties did not enter into formal, written contracts,

---

[9]     Any subsequent ruling in this Order regarding the "contracts" at issue necessarily excludes the alleged contracts between Ben-Trei and Ameristeel for the sale of materials to the Cartersville and Midlothian Mills during the fourth quarter of 2008.

the terms of the contracts at issue are expressed through various pieces of e-mail correspondence. The Court will therefore analyze such correspondence in determining whether the parties intended said contracts to constitute fixed-quantity or requirements contracts. *See GRM Corp. v. Miniature Precision Components, Inc.*, No 06-15231-BC, 2008 WL 82224, at *1 (E.D. Mich. Jan. 8, 2008) (unpublished) (noting that the RFQs, subsequent correspondence, and purchase orders constituted the contracts at issue in the case).

### 1.     General Law Governing Contract Interpretation

Oklahoma law provides that a contract must be interpreted to give effect to the mutual intent of the parties at the time they formed the contract. Okla. Stat. tit. 15, § 152; *May v. Mid-Century Ins. Co.*, 151 P.3d 132, 140 (Okla. 2006). Where a contract is in writing, the writing alone should be used to determine the parties' intent if possible. Okla. Stat. tit. 15, §§ 154 and 155. However, where the written agreement is ambiguous, a court can look to the negotiations preceding an agreement or other parol evidence to discern the intent of the parties. *Public Serv. Co v Home Builders Ass'n of Realtors, Inc.*, 554 P.2d 1181, 1185 (Okla. 1976); *see Devine v. Ladd Petroleum Corp.*, 743 F.2d 745, 748 (10th Cir. 1984) ("In the presence of an ambiguity, however, extrinsic evidence may be admitted to determine the parties' intent at the time they entered into the contract.") (citing *HBOP, Ltd. v. Delhi Gas Pipeline Corp.*, 645 P.2d 1042, 1044 (Okla. Ct. App. 1982)).

A contract is ambiguous if it can be interpreted as having two different meanings, s*ee K&K Food Servs., Inc., v. S&H, Inc.*, 3 P.3d 705, 708 (Okla. 2000); *National Am. Insur. Co. v. Am. Re-Insur. Co.*, 358 F.3d 736, 739-40 (10th Cir. 2004) (stating a contract is ambiguous if it is susceptible to two constructions), and determination of whether contract language is ambiguous is a question of law for the court, *Pitco Prod. Co. v. Chaparral Energy, Inc.*, 63 P.3d 541, 544-45 (Okla. 2003);

14

*Dodson v. St. Paul Ins. Co.*, 812 P.2d 372, 376 (Okla. 1991).  Finally, where the meaning of an ambiguous contract is in dispute, construction of the contract becomes a mixed question of fact and law and should be submitted to the jury.  *Hunter's Modern Appliance, Inc. v. Bank IV Okla.*, 949 P.2d 701, 703 (Okla. Civ. App. 1997).

2.    <u>Law Governing Formation of Requirements Contract</u>

Requirements contracts are governed by Section 2-306 of the Oklahoma Uniform Commercial Code, which provides as follows:

> A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.

Okla. Stat. tit. 12A, § 2-306(1).  A requirements contract is "one in which the purchaser agrees to buy all of its needs of a specified material exclusively from a particular supplier, and the supplier agrees, in turn, to fill all of the purchaser's needs during the period of the contract."  67 Am. Jur. 2d Sales § 224; *see Mason v. United States*, 615 F.2d 1343, 1346 (Ct. Cl. 1980); *Orchard Group, Inc. v. Konica Medical Corp.*, 918 F. Supp. 186, 192 (N.D. Ohio 1996).  This definition establishes that a requirements contract exists only when the contract (1) obligates the buyer to buy goods, (2) obligates the buyer to buy goods exclusively from the seller, and (3) obligates the buyer to buy all of its requirements for goods of a particular kind from the seller.  *Zemco Mfg. Inc. v. Navistar Int'l Transp. Corp.*, 186 F.3d 815, 817 (7th Cir. 1999) (citing James J. White & Robert S. Summers, *Uniform Commercial Code* § 3-9, at 154-55 (1995), and E. Alan Farnsworth, *Farnsworth on Contracts* § 2-15, at 135-37 (1990)).

15

In ascertaining whether a requirements contract has been formed, no specific language is necessary to create such a contract.  67 Am. Jur. 2d Sales § 224; *Fisherman Surgical Instruments, LLC v. Tri-Anim Health Servs., Inc.*, 502 F. Supp. 2d 1170, 1177 (D. Kan. 2007) ("The UCC . . .does not require particular words to enforce a requirements contract.").  With regard to the exclusivity requirement, "[t]he promise to purchase exclusively from one supplier may be implicit or explicit," but "there is no requirements agreement where they buyer fails to make an express or implied promise to purchase solely from the seller."  67 Am. Jur. 2d Sales § 225; *see Zemco*, 186 F.3d at 817 (discussing exclusivity requirement); *Cyril Bath Co. v. Winters Indus.*, 892 F.2d 465, 467 (6th Cir. 1989) (stating that a promise to purchase exclusively from one supplier may be either implicit or explicit in requirements contract).[10]

### 3.   Ben-Trei's Contracts with Ameristeel

The Court first turns to the language of the contracts between Ben-Trei and Ameristeel and finds that said language does not establish, as a matter of law, that the contracts are requirements contracts or fixed-quantity contracts.  Rather, the Court finds the language of the contracts – as expressed through the various pieces of correspondence between the parties – to be ambiguous and susceptible to multiple interpretations.  Specifically, there exists certain language in the correspondence that could suggest the parties intended to enter into requirements contracts – namely, the use of the word "forecasts" in the attached chart to Cooper's May 20, 2008 e-mail and the

---

[10]   Because there is a dearth of Oklahoma case law regarding the formation of requirements contracts, the Court turned to relevant law from other jurisdictions.  In conducting its research, it became apparent to the Court that the standards for forming a requirements contract are relatively constant among jurisdictions.  The Court has no reason to assume that the Oklahoma Supreme Court would choose to follow a different approach.

multiple inclusions of the word "requirement" in the e-mails between Thigpen, Cooper, and Dickerson. However, use of the term "requirement" is not necessarily dispositive of a requirements contract. *See Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough Prods., Inc.*, 212 F.3d 373, 378 (7th Cir. 2000) (finding contract was not requirements contract despite use of term "requirements" in contract language). Further, read in the context of the correspondence between Thigpen, Cooper, and Dickerson, it is not entirely clear as to whether the parties were using the term "requirement" as a term of art or within its customary nature.

Further confusing the issue is the e-mail exchange between Dickerson and Thigpen in June 2008, wherein Dickerson asked Thigpen to "confirm quantities and price by location." (6/18/08 Dickerson E-mail, Ex. 2 to Pl.'s Mot. for Partial Summ. J. Against Ameristeel.) This e-mail from Dickerson, which lacked any reference to "requirements," could suggest that the relevant contracts related to specific quantities of material as opposed to Ameristeel's general requirements for the relevant time periods. Further, Thigpen's confirmation e-mail also failed to reference Ameristeel's "requirements" and instead outlined specific prices and quantities of material to be supplied to the Beaumont, Cartersville, and Midlothian Mills. Thigpen also indicated that such material would be supplied "ratably" over the relevant time periods. Thigpen's e-mail could therefore be interpreted as confirming that the parties were entering into fixed-quantity contracts, wherein Ben-Trei was to supply a specific amount of material "ratably" to Ameristeel's mills at the prices outlined therein. Dickerson, in responding to Thigpen's confirmation e-mail, merely sought reassurance that the prices were "delivered prices," and did not make any statement indicating that the agreement, as outlined in Thigpen's e-mail, related to Ameristeel's requirements as opposed to a definite and defined quantity of material.

17

The Court therefore finds that the correspondence between the parties, wherein the terms of the contracts were outlined, does not establish as a matter of law that the contracts at issue are requirements contracts.  Instead, the relevant e-mails are susceptible to multiple interpretations, as the parties use the term "requirements" in certain e-mails and then, in subsequent correspondence, confirmed the deal by outlining specific quantities and prices without reference to any "requirements."  *See Zemco*, 186 F.3d at 817 (finding that contract language was susceptible to multiple interpretations and therefore did not establish, as a matter of law, that contract was or was not a requirements contract).  Accordingly, resort to extrinsic evidence is appropriate in such a situation.  *See Zemco*, 186 F.3d at 818 (turning to extrinsic evidence after finding that contract terms, standing alone, did not establish existence or non- existence of requirements contract); *Devine*, 743 F.2d at 748 (noting that extrinsic evidence may be used to determine parties' intent if language of contract is ambiguous) (applying Oklahoma law).

The parties cite to their course of dealing and subsequent conduct as the relevant extrinsic evidence that the Court should consider.  *See* Okla. Stat. tit. 12A, § 1-303(d) (stating that the parties' "course of dealing" is "relevant in ascertaining the meaning of the agreement of the parties, may give particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement"); *Currey v. Willard Steam Serv., Inc.* 321 P.3d 680, 685 (Okla. 1958) (noting that court may consider subsequent acts and conduct of parties in ascertaining intent of parties at time contract was made when contract terms are ambiguous).  With regard to the parties' course of dealing, Ameristeel cites to the February Ameristeel RFQ, which warned bidders, including Ben-Trei, that: (1) the "quantity noted is an estimate only and may fluctuate according to market conditions"; (2) "[t]here are no minimum quantities guaranteed"; and (3) "[a]ctual deliveries will

18

be scheduled by each mill and based on their actual requirements of the product only." (February Ameristeel RFQ, Ex. 1 to Ameristeel's Mot. for Summ. J.) Although not issued in conjunction with the contracts at issue, Ameristeel argues that the references to estimated quantities and use of the word "requirements" in said RFQ establish that the parties' course of dealing involved the formation of requirements contracts. The Court appreciates Ameristeel's argument but finds that this course of dealing does not conclusively establish the existence of requirements contracts with Ameristeel's mills in June 2008. First, there is no evidence in the record that the parties formed any sort of contract as a result of the February Ameristeel RFQ. Further, if one assumes that the February Ameristeel RFQ was intended as the basis for a requirements contract, the absence of similar language in contracts at issue could be interpreted to suggest an intention to enter into a different type of contract.

In looking at the subsequent conduct of the parties, the Court finds that this conduct is also subject to multiple interpretations in ascertaining the intent of the parties. Ameristeel cites the February 6, 2009 letter sent by Culver, Ben-Trei's counsel, wherein Culver states that "[a]s a requirements contract any termination must be made in good faith." (2/6/09 Culver Letter, Ex. 13 to Ameristeel's Resp. to Pl.'s Mot. for Summ. J. Against Ameristeel at 2.)[11] However, the letter sets

---

[11]    The Court rejects Ben-Trei's assertion that such letter is inadmissible pursuant to Federal Rule of Evidence 408 ("Rule 408"). Rule 408 provides that evidence of a party's statements made in "compromise negotiations" is not admissible to prove "liability for or invalidity of a claim." Although Ben-Trei attempts to characterize Culver's letter as a "confidential settlement communications," the Court agrees with Ameristeel's position that Culver's letter instead constitutes a demand for performance of the contracts between the parties and does not relate to settlement. Specifically, Culver's letter states as follows: "Demand is hereby made [for] [Ameristeel] to take delivery of the remaining undelivered amounts and to pay the agreed prices therefor." (2/6/09 Culver Letter, Ex. 13 to Ameristeel's Resp. to Pl.'s Mot. for Summ. J. Against Ameristeel at 2.) Notably absent from the letter is any discussion of compromise or settlement between the parties. The Court therefore finds Rule 408

forth specific quantities of materials that Ameristeel allegedly agreed to purchase at specific prices for shipment to the Cartersville, Midlothian, and Beaumont Mills, and Culver asserts that Ameristeel "affirmed the quantities " and "refused to take" material pursuant to the purchases.  This language could be read as evidencing the parties' intent to form a fixed quantity or take-or-pay contract.  At best, the language of Culver's letter is internally inconsistent.  Equally important, there is nothing in the record to suggest that Culver was involved in negotiating or forming the contracts at issue. Culver's statements and characterization of the contracts, therefore, are not particularly helpful in ascertaining the intent of the parties at the time they entered into the contracts.

Further, the other "subsequent conduct" cited by Ameristeel – namely, Thigpen's January 30, 2009 e-mail – is not completely in line with the assertion that the contracts constitute requirements contracts.  Ameristeel argues that in said e-mail, Thigpen "state[d] that the agreements in question were requirements contracts."  (Ameristeel's Mot. for Summ. J. 10.)  Ameristeel's argument misquotes the record, however, as Thigpen referred to the agreements at issue as a "take or pay contract **or** a requirements contract."[12]  (1/30/09 Thigpen E-mail, Ex. 12 to Ameristeel's Resp. to Pl.'s Mot. for Partial Summ. J. Against Ameristeel (emphasis added).)  Thigpen's January 30, 2009 e-mail could thus be read as exhibiting confusion as to the nature of the contracts at issue and reflects the fact that said contracts are subject to multiple interpretations.  If Ben-Trei had clearly intended to enter into requirements contracts, Thigpen's characterization of the contracts

---

inapplicable. *See Baker v. Dorfman*, No. 97-CIV-7512(DLC),1999 WL 191351, at *10 n.4 (S.D.N.Y. April 6, 1999) (unpublished) (noting demand letter at issue did not implicate Rule 408 because it did not include a settlement offer).

[12]    Ameristeel is cautioned to avoid such misrepresentations of the record in the future.

would seemingly have followed suit. Thus, the import of Ben-Trei's subsequent conduct is somewhat unclear and could reasonably lead to various conclusions regarding the parties' intent.

Finally, the Court considers whether the record demonstrates that Ben-Trei was to be the exclusive supplier of ferromanganese, which is a necessary element of a requirements contract, and again finds an issue of fact as to this question. Although the correspondence between the parties lacks any clear, definitive statement to this effect, Ameristeel presents testimony that the Beaumont, Midlothian, and Cartersville Mills did not obtain ferromanganese from a vendor other than Ben-Trei during the second half of 2008, suggesting that Ben-Trei was indeed the exclusive supplier. Ben-Trei, however, disputes this contention and submits documentation from Medima Mills, one of Ben-Trei's competitors, purportedly showing that Ameristeel purchased ferromanganese from Medima Mills during the second half of 2008. Specifically, Ben-Trei attaches an alleged "Outstanding Deliveries" chart produced by Medima Mills that allegedly reflects deliveries of ferromanganese to the Cartersville and Midlothian Mills during the fourth quarter of 2008. (Outstanding Deliveries Chart, Ex. 1 to Pl.'s Resp. to Ameristeel's Mot. for Summ. J.) Ben-Trei also attaches a blank purchase order from Ameristeel that is addressed to Medima Mills and dated October 7, 2008. (10/7/08 Purchase Order, Ex. 2 to Pl.'s Resp. to Ameristeel's Mot. for Summ. J.) Although these exhibits are somewhat unclear, it is uncertain as to whether Ben-Trei was the exclusive supplier of ferromanganese for Ameristeel's Beaumont, Midlothian, and Cartersville Mills, which is a necessary showing in order to find that the contracts at issue constitute requirements contracts.

Because more than one reasonable inference may be drawn from the extrinsic evidence presented to the Court, a question of fact is presented for the jury, and the issue of whether the parties entered into requirements contracts or fixed-quantity contracts is not proper for summary

judgment.  *See United States of America v. Continental Oil Co.*, 364 F.2d 516, 521-22 (10th Cir. 1966) ("Where . . .  to ascertain the meaning of the terms in a contract, resort must be had to extrinsic evidence, and the evidence is in conflict or more than one reasonable inference may be drawn therefrom, a question of fact, rather than law, is presented."); *Fowler v. Lincoln County Conservation District*, 15 P.3d 502, 507 (Okla. 2000) ("Where the meaning of an ambiguous written contract is in dispute, evidence of extrinsic facts and circumstances throwing light on the intention of the parties is admissible, and construction of such contract becomes a mixed question of law and fact, and is for jury determination under proper instructions.").  The Court therefore denies both Ben-Trei and Ameristeel's summary judgment motions as to the nature of the contracts between Ben-Trei and Ameristeel.  *See Zemco*, 186 F.3d at 818 (reversing district court's grant of summary judgment after finding existence of genuine issue of triable fact with respect to parties' intent where both contract language and course of dealing was susceptible to multiple interpretations).

        4.        <u>Ben-Trei's Contracts with Macsteel</u>

In turning to Ben-Trei's contracts with Macsteel, the Court again begins with an analysis of the language of the contracts.  Like Ben-Trei's contracts with Ameristeel, the Court finds that said language does not establish the nature of the contracts as a matter of law.  Instead, the Court finds that the contracts – as expressed through October and November 2007 e-mail correspondence – are ambiguous and susceptible to multiple interpretations.  Specifically, the inclusion of the statement "2008 Annual Requirements and Sizing Per Plant (note: quantities are estimated only and may vary up or down)" in the 2008 Macsteel RFQs could be read to suggest that Macsteel was requesting bids in conjunction with the formation of requirements contracts.  Thigpen's e-mail in response to the RFQs, wherein he refers to Macsteel's 2008 "requirements" could also be read to further this

conclusion.  However, the one-page document attached to Thigpen's e-mail contains a specific quantity of material and does not measure said quantity in terms of Macsteel's "requirements."  It is therefore unclear as to whether Thigpen was using the term "requirements" as a term of art or instead referring to a fixed quantity of materials needed by Macsteel, which would suggest a desire to enter into fixed-quantity contracts with Macsteel's mills.  Further, as noted previously, the use of the term "requirements" is not dispositive of a requirements contract, *see Brooklyn Bagel Boys*, 212 F.3d at 378, especially when, as here, it could be interpreted in multiple ways.  Weeks' e-mail in response to Thigpen's bid, wherein he informed Thigpen that Ben-Trei had been awarded the business in question, fails to include any statement clarifying whether the quantity in Ben-Trei's bid was fixed or was tied to Macsteel's requirements.  Instead, Weeks merely stated that Ben-Trei was "awarded the Std FeMn business for Macsteel's Fort Smith and Monroe plants."  (11/8/07 Weeks E-mail, Ex. 4 to Macsteel's Mot. for Summ. J.)  The absence of any clarifying language in response to Ben-Trei's bid could be read to suggest agreement with the formation of fixed-quantity contracts.  Therefore, because the language used in forming the contracts is ambiguous, the Court turns next to the extrinsic evidence presented by the parties.  *See Devine*, 743 F.2d at 748.

Macsteel argues that the parties' course of dealing and subsequent conduct reflect that the parties intended to enter into requirements, as opposed to a fixed-quantity, contracts.  An analysis of such evidence, however, demonstrates that there exists a genuine issue of triable fact with respect to the parties' intent, rendering denial of both Ben-Trei and Macsteel's motion for summary judgment as to this issue appropriate.  Specifically, certain pieces of extrinsic evidence could be interpreted to suggest that the parties intended for the contracts at issue to constitute requirements contracts.  The Fort Smith Purchase Orders, for example, state that the "total quantity [of material]

23

is estimated," which could imply that the parties intended the quantity of material to be determined based on Macsteel's requirements for the year.  However,  the Monroe Purchase Orders contain no such "estimate" language, casting some doubt on the import of this language in the Fort Smith Purchase Orders.  It is unclear as to whether the inclusion of this language in one set of purchase orders, but not the other, reflects an intent to enter in to a different type of contract with each mill, or whether such language has no bearing on the nature of the contract between the parties.  *See Advanced Plastics Corp. v. White Consol. Indus.*, 828 F. Supp. 474, 488  n.1 (E.D. Mich. 1993) (finding contract was not requirements contract despite fact that RFQs stated "Estimated yearly usage is estimate only. Do not construe as firm commitment").

The subsequent conduct of the parties can similarly be interpreted in multiple ways. According to Macsteel, the January 30, 2009 e-mail from Thigpen, wherein he refers to the contracts with Ameristeel and Macsteel as "take or pay contract[s] or . . . requirement contract[s]," (1/30/09 Thigpen E-mail, Ex. 10 to Macsteel's Resp. to Pl.'s Mot. for Partial Summ. J. Against Macsteel), and the February 6, 2009 letter from Culver, referring to Ameristeel's contracts with Ben-Trei as "requirement contract[s]," (2/6/09 Culver Letter, Ex. 11 to Macsteel's Resp. to Pl.'s Mot. for Partial Summ. J. Against Macsteel at 2), both demonstrate the parties' intent to enter into requirements contracts.  However, for the reasons outlined above, *see* Section III.B.3 *supra*, the Court finds these pieces of evidence susceptible to multiple interpretations and inconclusive as to the parties' intent. Further, the Culver letter, on its face, only applies to Ben-Trei's contract with Ameristeel, rending its usefulness in analyzing the contracts between Ben-Trei and Macsteel questionable.

Nor does the Court find Weeks' October 16, 2008 e-mail, informing Thigpen that Fort Smith "intend[ed] to use the Std Fe Mn material [it had] on order with Ben-Trei," particularly instructive.

24

(10/16/08 Weeks E-mail, Ex. 7 to Pl.'s Mot. for Partial Summ. J. Against Macsteel.)  Although Weeks refers to the material Macsteel had "on order," which could suggest a set amount of material as opposed to an amount of material based on Macsteel's requirements, Weeks could have easily made such a statement even had the contract constituted a requirements contract.  The language used by Weeks is simply not clear enough to shine definitive light on the parties' intent.

Finally, Ben-Trei cites to LaFayette's request for delivery of materials on January 8, 2009 as demonstrating the existence of a fixed-quantity contract.  According to Ben-Trei, had Macsteel considered its contracts with Ben-Trei to constitute requirements contracts, there would be no reason to take material after the expiration of the contracts in 2008.  While this reading of LaFayette's request may very well be correct, the Court is unwilling to find, as a matter of law, that the contracts constitute fixed-quantity contracts on such a basis given the ambiguities in the language of the contracts and other extrinsic evidence, as outlined above by the Court.  In sum, there exists a genuine issue of material fact as to the parties' intent with regard to the nature of the contracts at issue and the Court is unable to determine, as a matter of law, whether said contracts are requirements contract or fixed-quantity contracts.  As such, this issue presents a question of fact for the jury and the Court denies both Ben-Trei and Macsteel's summary judgment motions as to the nature of the contracts in question.  *See Zemco*, 186 F.3d at 818 (finding existence of genuine issue of triable fact with respect to parties' intent where both contract language and course of dealing was susceptible to multiple interpretations); *Continental Oil Co.*, 364 F.2d at 521-22 (noting that a question of fact is presented as to meaning of a contract when more than one reasonable inference may be drawn from extrinsic evidence).

C.      **Whether Ameristeel and Macsteel Breached Contracts with Ben-Trei**

In addition to moving for summary judgment as to the nature of the contracts between Ben-Trei and Defendants, the parties also move for summary judgment with regard to whether Ameristeel and Macsteel breached such contracts.  However, because the Court finds a fact question as to the nature of the contracts in question, *see* Sections III.B.3 and III.B.4, it cannot, as a matter of law, determine whether said contracts were breached.  The parties' motions for summary judgment are therefore denied as to this issue.

## IV.      Breach of Duty of Good Faith and Fair Dealing

Defendants move for summary judgment as to Ben-Trei's claim of breach of the duty of good faith and fair dealing, arguing that Oklahoma does not recognize such a claim in this case.  In its response brief, Ben-Trei asserts that "it does not intend to assert an independent claim of breach of duty of good faith and fair dealing . . . at trial."  (Pl.'s Resp. to Ameristeel's Mot. for Summ. J. 13; Pl.'s Resp. to Macsteel's Mot. for Summ. J. 11.)  Defendants' motions for summary judgment are therefore granted as to this claim.

## V.      Promissory Estoppel and Breach of Implied Contract

Finally, Defendants move for summary judgment as to Ben-Trei's claims for promissory estoppel and breach of implied contract.  In support of this motion, Defendants maintain that the implied contract doctrine applies only when there is no evidence of an express agreement between the parties.  Defendants therefore contend that to the extent the Court finds the existence of express agreements between the parties, Ben-Trei's claim for breach of implied contract necessarily fails. *See Watkins v. Watkins*, 177 P.3d 1114, 1118 (Okla. Civ. App. 2007) (stating that the "implied-in-fact- [contract] doctrine . . . applies only when there is no evidence from which to determine if the

26

parties had an express agreement").  Similarly, in seeking summary judgment as to the promissory

estoppel claim, Defendants argue that Ben-Trei cannot maintain a claim for both breach of contract

and promissory estoppel, as promissory estoppel is inapplicable when the parties have reached an

agreement.  *See Bickerstaff v. Gregston*, 604 P.2d 382, 384 (Okla. Civ. App. 1979) (explaining that

"promissory estoppel is a doctrine . . . whereby a person who reasonably relies to his detriment on

another's promise is given by law the benefit of a contract wherein an agreement did not come to

fruition") (further stating that "where an agreement has been reached detrimental reliance on the

contract can create no greater rights than one possesses under the contract").

      Ben-Trei does not dispute Defendants' statement of the law, but instead maintains that its

inclusion of these claims in its Amended Complaint represents "alternative pleading."  Specifically,

Ben-Trei asserts that it "does not seek to recover for both breach of express contract and breach of

implied contract [or] for both breach of contract and promissory estoppel."  (Pl.'s Resp. to

Ameristeel's Mot. for Summ. J. 13-14; Pl.'s Resp. to Macsteel's Mot. for Summ. J. 11.)  Rather,

Ben-Trei asserts these claims as an alternative "in the event that the trier of fact should find that a

necessary element for an express contract claim is lacking."  (*Id.*)  As explained above, the Court

has found the existence of express contracts between: (1) Ben-Trei and Ameristeel for the sale of

ferromanganese to the Beaumont Mill for the third and fourth quarters of 2008 and for the sale of

ferromanganese to the Cartersville and Midlothian Mills for the third quarter of 2008; and (2) Ben-

Trei and MacSteel for the sale of ferromanganese to the Fort Smith and Monroe Mills during the

entirety of 2008.  Therefore, Defendants' summary judgment motions as to Ben-Trei's promissory

estoppel and breach of implied contract claims are granted as to these contracts.  However, there

exists a genuine issue of fact as to whether Ben-Trei and Ameristeel entered into contracts for the

sale of ferromanganese to the Cartersville and Midlothian Mills for the fourth quarter of 2008, *see* Section III.A.1. *supra*.  Defendants' summary judgment motions as to Ben-Trei's promissory estoppel and breach of implied contract claims are therefore denied as to these alleged contracts.

## VI.      Conclusion

For the reasons outlined herein, the Court DENIES Ben-Trei's Motion for Partial Summary Judgment Against Gerdau Ameristeel US, Inc. (Doc. 56) and Ben-Trei's Motion for Partial Summary Judgment Against Gerdau Macsteel, Inc. (Doc. 58).

Ameristeel's Motion for Summary Judgment (Doc. 59) and Macsteel's Motion for Summary Judgment (Doc. 60) are GRANTED IN PART and DENIED IN PART.  Specifically, Defendants' summary judgment motions are granted as to: (1) Ben-Trei's breach of good faith and fair dealing claim; and (2) Ben-Trei's promissory estoppel and breach of implied contract claims for all contracts except the alleged contracts between Ben-Trei and Ameristeel for the sale of ferromanganese to the Cartersville and Midlothian Mills during the fourth quarter of 2008.  Defendants' summary judgment motions are denied as to Ben-Trei's breach of contract claim.

**IT IS SO ORDERED this 31st day of March, 2010.**

**TERENCE C. KERN**
**United States District Judge**