**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **BEN-TREI OVERSEAS, L.L.C. d/b/a BEN-TREI METALS and ALLOYS, and BEN-TREI LTD.,** ) ) ) ) | |
| Plaintiffs, ) ) | Case No. 09-CV-153-TCK-TLW |
| vs. ) ) | |
| **GERDAU AMERISTEEL US, INC. et al.,** ) ) | |
| Defendants. ) | |

**OPINION AND ORDER**

Before the Court is Defendants' Motion to Exclude Testimony and Report[1] of Plaintiff's Expert (Doc. 57). Plaintiffs Ben-Trei Overseas, L.L.C. d/b/a/ Ben-Trei Metals and Alloys, and Ben-Trei Ltd. (collectively referenced herein as "Ben-Trei") allege that Defendants breached certain fixed-quantity contracts for the sale of materials used in the manufacture of steel. Ben-Trei generally alleges that Defendants have taken delivery of only a fraction of the contracted materials, thereby breaching the relevant contracts. Defendants generally assert that, to the extent contracts existed, they were requirements contracts, and Defendants reduced their requirements in good faith.

**I.  The Expert**

Ben Trei listed James R. Vreeland as an expert witness who will testify regarding custom and practice in the steel industry generally, and regarding fixed-quantity and requirements agreements for the purchase of metal alloys in particular. In his report, dated September 28, 2009, Vreeland sets forth his general qualifications and opinions with regard to this case. As a buyer for

---

[1]  The Court does not allow expert reports to be admitted into evidence. At the pretrial conference, defense counsel notified the Court that Defendants have withdrawn their request for the Court to exclude the report.

a steel mill, Vreeland claims to have 20 years of responsibility for inventory and estimating usage and negotiating purchase orders for the purchase of metals and metal alloys. Defendants object to almost all of his opinions and conclusions, which are as follows:

> From a buyer's perspective, the purpose of entering into a fixed quantity or requirements agreement for the purchase of metal alloys is to allocate the risk of price fluctuations and to ensure availability of the product. Meanwhile, the seller ensures that it has a buyer for its product. By entering into an agreement for the purchase of metal alloy, the buyer assumes the risk that the price of the material will go down, and that the buyer will have to pay more than market price for the materials. Conversely, the seller assumes the risk that the price of the material will increase, and it will realize less profit on the materials than it would under market prices. Within the steel industry, a fluctuation in market prices is not a justification or excuse for a buyer failing to take ordered materials or the seller failing to procure ordered materials.
>
> In the steel industry, suppliers of metal alloys are expected to timely procure and deliver materials when such materials are released by the buyer. Accordingly, sellers must acquire and store the materials, and do so in reliance on the buyer's promise to take delivery and pay for the materials. A buyer of metal alloys should know and expect that the seller has acquired the ordered materials and is incurring storage costs for those materials.
>
> When a buyer uses the term "estimate" on a purchase order, the buyer has an expectation that the seller will be able to timely procure and deliver the full amount of "estimated" material. Accordingly, sellers must acquire and store the full quantity of "estimated" materials, and do so in reliance on the buyer's promise to take delivery and pay for the materials. A buyer of metal alloys should know and expect that the seller has acquired the full quantity of "estimated" materials and is incurring storage costs for those materials. When a buyer in the steel industry uses the term "estimate," is it usual and customary for the buyer to take delivery and pay for the full amount of estimated materials. Reasonable deviations from these quantities, i.e., up to 10%, occur occasionally and tend to be accommodated if possible.
>
> Recently several foreign business entities have entered the United States steel industry. In my experience, these companies do business differently than the American companies. These companies often attempt to renegotiate purchase orders when market conditions change, and nonperformance has been a problem.

(Mot. to Exclude. Doc. 57, Ex. 1.)

**II. Analysis**

A "witness qualified as an expert by knowledge, skill, experience, training, or education" may testify as to "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702. In order to determine whether an expert opinion is admissible, the court performs a two-step analysis. First, the court must determine whether the expert is qualified by "knowledge, skill, experience, training, or education" to render an opinion. *See id.* Second, if the expert is so qualified, the court must determine whether the opinion is reliable and relevant under the principles set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). Defendants do not directly challenge the expert's qualifications here other than to question whether he can testify as to one statement. That issue will be addressed more fully below. The Court finds that Vreeland is generally qualified to testify as an industry expert on behalf of Plaintiff.

The focus of Defendants' motion is whether Vreeland's opinions are reliable or relevant. Expert testimony must be based on a reliable methodology to be admissible. *See, e.g., Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232 (10th Cir. 2004). This does not mean, however, that the offering party must prove "that the expert is undisputably correct" for the expert evidence to be admissible. *Id.* at 1233 (citation omitted). Rather, the party need only prove that "the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which sufficiently satisfy Rule 702's reliability requirements." *Id.* at 1233 (citation omitted).

Defendants do not challenge attack Vreeland's methodology *per se*, given that his testimony is comprised primarily of general statements as to the negotiation of materials contracts in the steel industry. As such, his testimony falls into the category of "other specialized knowledge" rather than

scientific knowledge. *See Kumho*, 526 U.S. at 150 (explaining that four *Daubert* criteria governing scientific evidence are not necessarily applicable in every case and can be applied flexibly to areas of expertise that do not possess the traditional indicia of scientific acceptance). In this case, Vreeland's knowledge is grounded in his industry experience. The factors related to "peer review" and "scientific testing" have little application because his experience is based on his specialized knowledge of estimating usage and negotiating purchase orders for the purchase of metals and metal alloys for steel mills. The Court finds Vreeland's methodology, which consists of applying his experience to the issues in general, to be sufficiently reliable. Specific areas of testimony, however, may be excluded, as discussed below.

Defendants make three general arguments: (1) Vreeland's report and testimony will not be helpful; (2) Vreeland's report contains inadmissible speculation and legal conclusions; and (3), Vreeland's condemnation of foreign companies should be excluded.

### A.     Helpfulness

First, Defendants argue that Vreeland's testimony will not be helpful. This argument refers to statements Vreeland makes in the first paragraph of the report, in particular. Defendants contend that Vreeland does not attempt to apply the broad statements therein to the facts of this case. They assert that jurors have a basic understanding of contracts and fundamental economics and do not need an expert to explain common sense concepts. Defendants contend that Vreeland offers no explanation for how or why his experience leads to any of this conclusions or opinions. Defendants rely on the following advisory committee note:

> If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's

4

> gatekeeping function requires more than simply taking the expert's word for it.

Fed. R. Evid. 702 advisory committee's note, 2000 Amendments.

Plaintiff points out that Vreeland's testimony discusses practices in the steel industry. Ben-Trei submits that may Oklahoma jurors may not have any experience or understanding regarding the customs and practices in the steel industry. Specifically, Plaintiff asserts that Vreeland's testimony will assist the trier of fact in deciding whether the contracts at issue were requirements contracts or fixed-quantity contracts. Ben-Trei posits that expert testimony explaining general principles is admissible, without application of the principles to the facts of the case, if the explanation would assist the trier of fact and is found to be reliable. Fed. R. Evid. 702 advisory committee's note, 2000 Amendments.

The Tenth Circuit has stated: "Doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility unless there are strong factors such as time or surprise favoring exclusions. The jury is intelligent enough . . . to ignore what is unhelpful in its deliberations." *Robinson v. Missouri Pac. R.R. Co.*, 16 F.3d 1083, 1090 (10th Cir. 1994) (citation omitted). The Court finds that Vreeland's testimony about the steel industry in general and agreements used in the purchase of metal alloys, in particular, could assist the trier of fact to understand the evidence or to determine a fact in issue. Vreeland's testimony in this regard will not be preliminarily excluded.

### B. Inadmissible Speculation and Legal Conclusions

Second, Defendants argue that Vreeland's report contains inadmissible speculation and legal conclusions. Defendants challenge four areas of potential testimony.

### 1. "Within the steel industry, a fluctuation in market prices is not a justification or excuse for a buyer failing to take ordered materials or the seller failing to procure ordered materials."

Defendants takes exception to the last sentence of the first paragraph by stating that it assumes facts in evidence, lacks any support, and seeks to instruct the jury as to the law, at least as Vreeland understands it. The statement is: "Within the steel industry, a fluctuation in market prices is not a justification or excuse for a buyer failing to take ordered materials or the seller failing to procure ordered materials." (*See* Mot., Doc. 57, Ex. 1.)  Defendants dispute this statement, arguing that an economic recession and a drop in demand for steel could be considered "valid business reasons" for a buyer failing to take ordered materials. *See Padilla v. United States*, 58 Fed. Cl. 585, 589 (Fed. Cir. 2003) (citation omitted).  The issue is important because, if the jury determines that certain contracts at issue are requirements contracts, jurors may have to determine whether Ben-Trei's "reduced its requirements" or failed to take ordered materials in bad faith.  Thus, Defendants contend that Vreeland's statement invades the province of the jury, and  "[e]xpert testimony as to legal conclusions that will determine the outcome of a case is inadmissible." *In re Ocean Bank*, 481 F. Supp.2d 892, 898 (N.D. Ill. 2007) (citation omitted).

Plaintiff argues that Defendants have simply mischaracterized Vreeland's statement and that it is merely Vreeland's opinion, based on his experience, that he does not consider market price fluctuations as justification for breaching a purchase contract. If Vreeland's testifies in this manner, the Court sees no valid reason to exclude it.   It is not an attempt to instruct the jury on the law, but the inform the jury based on his experience.

6

### 2. "Accordingly, sellers must acquire and store the materials, and do so in reliance on the buyer's promise to take delivery and pay for the materials."

Defendants challenge Vreeland's testimony in the second paragraph of the report by pointing out that he has never been employed as a seller of raw materials used in the production of steel products and, thus, he cannot testify that "sellers must acquire and store the materials, and do so in reliance on the buyer's promise to take delivery and pay for the materials." (Mot. to Exclude, Doc. 57, Ex. 1.) According to Defendants, this is testimony regarding the obligations of sellers and their state of mind. Defendants also argue that this testimony is speculative, and experts are not permitted to speculate. *Goebel v. Denver and Rio Grande Western R.R. Co.*, 215 F.3d 1083, 1088 (10th Cir. 2000) (citation omitted). In addition, Defendants contend that this testimony invades the province of the jury because reliance is an element of Plaintiff's claims for promissory estoppel. *Cf. Aguilar v Int'l Longshoremen's Union Local No. 10*, 966 F.2d 443, 447 (9th Cir. 1992) ("Here, the reasonableness and foreseeability of the [plaintiffs'] reliance were matters of law for the court's determination. As such, they were inappropriate subjects for expert testimony.")

Plaintiff maintains that the steel industry is not like the retail industry where potential purchases are abundant and interchangeable. The steel industry, Ben-Trei argues, depends on the interrelation and cooperation of suppliers, sellers, and buyers. The Court does not deem Vreeland's statement with regard to reliance to be a legal conclusion in this case as he refers to sellers in general and not Ben-Trei in particular. Nor is the statement speculative. The fact that Vreeland was a buyer and not a seller does not disqualify him to testify generally, based on his experience, as to the activities or motivations of sellers involved in the negotiation of contracts in the steel industry. If his trial testimony is more specific, however, defendants may raise the issue at trial.

> **3. "A buyer of metal alloys should know and expect that the seller has acquired the ordered materials and is incurring storage costs for those materials" and "A buyer of metal alloys should know and expect that the seller has acquired the full quantity of 'estimated' materials and is incurring storage costs for those materials."**

Defendants challenge the last sentence of the second paragraph, and the third sentence of the third paragraph because Vreeland is opining that a buyer "should know and expect" that the seller has acquired the ordered or estimated quantity of materials and is incurring storage costs for those materials. Defendants claim that these statements are speculative, unsupported by analysis, and that they state legal conclusions.

Plaintiff argues again that the steel industry is unique, and Vreeland's testimony is necessary so that jurors do not try to relate this dispute to one in the retail industry. Ben-Trei insists that the opinions are not legal conclusions and that Defendants can rebut the evidence with testimony by their own witnesses.

The Court does not find this kind of testimony inadmissible. As the Supreme Court acknowledged in *Daubert*, expert opinion may best be attacked through the traditional means of "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." 509 U.S. at 596. Vreeland's testimony as to what a buyer "should know and expect" will not be excluded.

> **4. "When a buyer in the steel industry uses the term 'estimate,' is it usual and customary for the buyer to take delivery and pay for the full amount of estimated materials. Reasonable deviations from these quantities, i.e., up to 10%, occur occasionally and tend to be accommodated if possible."**

8

Defendants take issue with Vreeland's statement in the last sentence of the third paragraph as to what the term "estimate" means and what reasonable deviations from estimates would be. Defendants argue that this is an attempt to instruct the jury on the standard of reasonableness which should be defined, instead, by the standard of reasonableness referenced under Oklahoma's version of the UCC:

> A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.

Okla. Stat. tit. 12A, §2-306(1). Defendants rely on case law for the proposition that a witness cannot be permitted to define the law of the case. *Specht v. Jensen,* 853 F.2d 805, 809-10 (10th Cir. 1988).

Plaintiff contends that Vreeland's testimony merely provides jurors with the "factual framework" they will need to decide questions relating to requirements contracts, if they decide (and the Court instructs) that the contracts were requirements contracts. The jurors in this case may ultimately have to grapple with the term "estimate" and decide whether Defendants' deviation from the amount ordered was reasonable. However, the Court does not deem Vreeland's testimony to be an attempt to instruct the jury on the standard of reasonableness. To the extent that Vreeland testifies as to "reasonable deviations" that people in the industry find acceptable, his testimony will be permitted.

### C. Condemnation of Foreign Companies

In the last paragraph of Vreeland report, he states: "Recently several foreign business entities have entered the United States steel industry. In my experience, these companies do business differently than the American companies. These companies often attempt to renegotiate purchase

orders when market conditions change, and non performance has been a problem." (Mot. to Exclude, Doc. 57, Ex. 1.)  Defendants object to this paragraph of Vreeland's report because (1) it begins with a factual statement, not an opinion or conclusion; (2) the second sentence is irrelevant, fails to assist the trier of fact, is unduly prejudicial, is confusing and is a waste of time (*see* Fed. R. Evid. 403); and (3) the third and final sentence is an attempt to convince the jury that these Defendants must be liable because their parent company is based in South America and not in the United States. Defendants contend that Vreeland does not provide an example or describe any analysis or technique he undertook to arrive at his conclusions about foreign companies and his conclusion does not tend to prove that these defendants failed to perform the agreements at issue in this case.

Plaintiff argues that an expert may testify in the form of an opinion or otherwise," Fed. R. Evid. 702; therefore, whether the statement is a fact or opinion is irrelevant. Ben-Trei maintains that the opinion is not an attempt to prejudice the jury.  According to Plaintiff, the statement that steel companies outside the United States do business differently has no derogatory connotations; it simply gives "perspective to this contractual dispute and, again, provides a factual framework for the jurors . . . ."  (Resp. Br., Doc. 69, at 9.)

The Court disagrees, primarily because Vreeland's statements as to foreign companies are unduly prejudicial. Whether foreign companies do business differently than American companies is also irrelevant and fails to assist the trier of fact.   The implication from Vreeland's report is that these Defendants must be liable because their parent company is based in South America and not in the United States.  As such, his comments regarding foreign companies are excluded.

10

### III. Conclusion

Accordingly, Defendants' Motion to Exclude Testimony and Report of Plaintiff's Expert (Doc. 57) is GRANTED IN PART and DENIED IN PART as set forth herein.

**IT IS SO ORDERED this 16th day of April, 2010.**

**TERENCE C. KERN
United States District Judge**